**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
ALEXIS M. WOOD (SBN 270200)
*alexis@consumersadvocates.com*
KAS L. GALLUCCI (SBN 288709)
*kas@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELLY ROBINSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE HOME DEPOT, INC.,<br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Shelly Robinson, on behalf of herself and all others similarly situated ("Plaintiff"), by and through her undersigned counsel, hereby sue Home Depot, Inc., ("Defendant" or "Home Depot") and, upon information and belief and investigation of counsel, alleges as follows:

## I. INTRODUCTION

1. "Since the advent of online behavioral advertising ('OBA') in the late 1990s, businesses have become increasingly adept at tracking users visiting their websites." *Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108, 111 (W.D. Pa. 2019) (citations omitted).

2. This is a class action suit brought against Home Depot for wiretapping the electronic communications of visitors to Defendant Home Depot's website, homedepot.com (the "Website"). By doing so, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal Penal Code §§ 631 and 635, and invaded Plaintiff's and Class Members' privacy rights in violation of the California Constitution.

3. As discussed in detail below, Defendant utilized "session replay" software to intercept Plaintiff's and the Class Members' electronic computer-to-computer data communications with Defendant's Website, including website visitors' keystrokes, mouse clicks[1], shipping and billing address, and other electronic communications, including the entry of Personally Identifiable Information ("PII"), in real time while visiting the Website. Defendant intercepted, stored, and recorded electronic communications regarding the webpages visited by Plaintiff and the Class members, as well as everything Plaintiff and the Class Members did on those pages, e.g., what they searched for, what they looked at, the information they inputted, and what they clicked on.

---

[1] As used herein, the term "mouse clicks" also refers to "touch gestures" such as the "tab," "swipe," and similar gestures used on touchscreen devices.

4. The "session replay" software utilized by Defendant is not a traditional website cookie, tag, web beacon, or analytics tool. It is a sophisticated computer code that allows Defendant to contemporaneously intercept, capture, read, observe, re-route, forward, redirect, and receive incoming electronic communications to its Website. Plaintiff's and the Class members' electronic communications are then stored by Defendant using an outside vendor's services and can later be viewed and utilized by Defendant to create a session replay, which is essentially a video of a Class member's entire visit to Defendant's website.

5. "Technological advances[,]" such as Defendant's use of session replay technology, "provide 'access to a category of information otherwise unknowable' and 'implicate privacy concerns' in a manner different from traditional intrusions as a 'ride on horseback' is different from 'a flight to the moon.'" *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1273 (9th Cir. 2019) (quoting *Riley v. California*, 573 U.S. 373, 393 (2014)).

6. Unlike typical website analytics services that provide aggregate statistics, the session replay technology utilized by Defendant is intended to record and playback individual browsing sessions, as if someone is looking over a Class members' shoulder when visiting Defendant's Website. The technology also permits companies like Defendant to view the interactions of visitors on their website in real-time.

7. In or about January 2021, and during this past year, Ms. Robinson visited the Website. During the visits, Defendant recorded Plaintiff's electronic communication in real time, including Plaintiff's mouse clicks, keystrokes, scrolls, mouse movements, shipping and billing address, and information about web pages viewed on the Website.

8. Plaintiff brings this action on behalf of herself and a class of all persons whose electronic communications were intercepted through the use of Defendant's wiretap on the Website.

## II.   JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because at least one member of the class, as defined below is a citizen of a different state than Defendant, there are more than 100 members of the class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

10. The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in this State, and Plaintiff's claims arise out of Defendant's forum-related activities. Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this District.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the injury in this case substantially occurred in this District.

12. Defendant also purposefully directed its activities in California, and the wiretapping at issue here arises from or relates to Defendant's activities. As alleged more fully below, Defendant intentionally installed the wiretap at issue here on homedepot.com. The conduct also was expressly aimed at California residents. California is the largest market in the United States—indeed, if California were its own nation, California would have the fifth largest economy in the world. Defendant knew that a significant number of Californians would visit Home Depot's website, because they form a significant portion of Home Depot's target market. By intercepting the transmissions of the Website's users, Defendant targeted its wrongful conduct at customers, some of whom Defendant's knew, at least constructively, were residents of California. It was foreseeable that Defendant's interceptions and wiretapping would harm Plaintiff and similarly-situated individuals, and that at least some of this harm would occur in California—where Defendant knew many customers and prospective customers resided.

13. The Website has a national viewership and scope, which appeals to, and

profits from, an audience in one particular state above most others: California. Because of the substantial California market, Defendant anticipated, desired, and achieved a substantial California viewer base.

### III. PARTIES

14. Plaintiff Shelly Robinson ("Robinson") is a resident of Brentwood, California.

15. Defendant Home Depot, is a legal corporation established under the laws of the State of Delaware with its headquarters in Atlanta, Georgia.

16. Home Depot is a home improvements retailer that sells building materials and home improvement products in brick-and-mortar stores as well as online through its Website.

17. Home Depot operates throughout the United States (including California), Canada, China, and Mexico.

18. Home Depot owns and operates homedepot.com. Home Depot conducts substantial and not isolated activity and business in California.

19. At all times material to this Complaint, Defendant has advertised, marketed, distributed and sold products online to consumers throughout the United States.

### IV. STATEMENT OF FACTS

**Wiretapping Via Session Reply Software**

20. At all relevant times herein, Home Depot has engaged Quantum Metric, Inc. ("QM"), a marketing software-as-a-service ("SaaS") company, to provide marketing analytics software for its Website.

21. QM is a Delaware corporation with its principal place of business in Colorado Springs, Colorado.

22. QM develops, owns, and markets a software of the same name that provides marketing analytics, which is used by Home Depot on its Website.

23. QM software provides a feature called session replay which purports to

help businesses improve their website design and customer experience. QM operates on both desktop and mobile devises.

24. According to QM, "Session reply is the reproduction of a user's interactions on web or native mobile applications. Session replay captures things like mouse movements, clicks, typing, scrolling, swiping, tapping, etc." https://www.quantummetric.com/product-analytics/session-replay/; (last visited July 16, 2021). Session replay allows companies "to pull up any user who ha[s] visited [a] website and watch their journey as if [the company] was standing over their shoulder." A company can "see every click, every tap and exactly what the website responded with – an error, a success message, or nothing." *Id*.

25. QM says its session replay feature "capture[s] all the metadata the replay – like user platform, API calls, and network details – as well as dozens of out of the box events and errors, plus the custom one you'll configure in our UI." *Id*.

26. QM's product demo allows a preview of the session replay interface and demonstrates how the software works, highlighting that the software allows a company to see each website visitor's electronic communications, including what a visitor clicked on, when a visitor reloaded a page, and where a visitor's mouse pointer is located at any given moment.

27. QM notes that "[o]nce data is captured, it's sent encrypted via a forward secrecy SSL connection, to the Quantum Metric cloud service, hosted in a secured Google Compute cloud." *Id*.

28. QM's website includes a marketing video that discusses the session reply feature. The video touts that companies can "[s]ee actual customer interaction." The marketing presentation then shows a mock mobile user visiting and interacting with a website. The video shows what items the visitor viewed and added to their cart. The presentation then proceeds to show where exactly the mock visitor clicked on the website.

29. The purported use of session replay technology is to monitor and

discover broken website features. However, the extent and detail of the data collected by users of the technology, including Defendant, far exceeds the stated purpose and Plaintiff's and the Class members' expectations when visiting websites like Defendant's. The technology not only allows the recording and viewing of a visitor's electronic communications with a website, but also allows the user to create a detailed profile for each visitor to the site. Indeed, in a pending patent dispute, a well-known session replay provider openly admitted that this type of technology is utilized by companies like Defendant to turn a profit: "[the] software computes billions of touch and mouse movements and transforms this knowledge into profitable actions that increase engagement, reduce operational costs, and maximize conversion rates (i.e., the percentage of users who take desired actions on a website, such as purchasing a product offered for sale)." *Content Square SAS v. Quantum Metric, Inc.*, Case No. 1:20-cv-00832-LPS, Compl. at ¶8, [DE 1] (D. Del. Jun. 22, 2020).

30.   Moreover, the collection and storage of page content by such session replay scripts may cause sensitive information and other personal information displayed on a page to leak to third parties. This may expose website visitors to identity theft, online scams, and other unwanted behavior.

31.   Technology like QM's is not only highly intrusive, but dangerous. A 2017 study by Princeton University found that session recording technologies like QM's Session Reply were collecting sensitive user information such as passwords and credit card numbers. The research notes that this was not simply the result of a bug, but rather insecure practices. Thus, technologies such as QM's leave users vulnerable to data leaks and the harm resulting therefrom.

32.   In 2019, Apple warned application developers using session replay technology that they were required to disclose such tracking and recording to their users, or face being immediately removed from the Apple Store: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines

require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity." https://techcrunch.com/2019/02/07/apple-glassbox-apps/; (last visited July 12, 2021).

33. Consistent with Apple's concerns, countless articles have been written about the privacy implications of recording user interactions during a visit to a website, including the following examples:

(a) ***The Dark Side of 'Replay Sessions' That Record Your Every Move Online***, located at https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/; (last visited July 12, 2021);

(b) ***Are Session Recording Tools a Risk to Internet Privacy?***, located at https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/; (last visited July 12, 2021);

(c) ***Session Replay is a Major Threat to Privacy on the Web***, located at https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720; (last visited on July 12, 2021);

(d) ***Session Replay Scripts Could be Leaking Sensitive Data***, located at https://medium.com/searchencrypt/session-replay-scripts-could-be-leaking-sensitive-data-5433364b2161; (last visited on July 12, 2021); and

(e) ***Website Owners can Monitor Your Every Scroll and Click***, located at https://www.digitalinformationworld.com/2020/02/top-brands-and-websites-can-monitor-your-every-scroll-and-click.html; (last visited July 12, 2021);

(f) ***No Boundaries: Exfiltration of Personal Data By Session-Reply Scripts***, located at https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/; (last visited July 12, 2021);

(g) ***Session Replay: Great CRO Tool Or Privacy Nightmare***, located at https://systemtrap.org/503; (last visited July 12, 2021).

34. QM's business model involves entering into voluntary partnerships with various companies and providing their software to their partners.

35. One of QM's partners is Home Depot.

36. Home Depot has installed and utilizes QM's software on its Website for the purpose of capturing information about the visitors on its Website.

37. Home Depot knows that QM's software captures keystrokes, mouse clicks, and other communications of visitors to its Website, and pays QM to supply that information.

38. Pursuant to an agreement with QM, Home Depot enabled QM's software by intentionally embedding QM's software code on the Website.

39. As currently deployed, QM's software, as employed by Home Depot, functions as a wiretap.

**Defendant Wiretapped or Facilitated the Wiretap of Plaintiff's and Class Members' Electronic Communications**

40. On or around January 12, 2021, and during the past year, Plaintiff visited homedepot.com.

41. During Plaintiff's January 12, 2021 visit to the Website, Plaintiff placed items in her cart, however, did not place an order.

42. During that visit, and upon information and belief, the session replay feature in QM's software as embedded on Defendant's Website created a video capturing each of Plaintiff's keystrokes and mouse clicks on the Website. The QM wiretap used by Defendant also captured the date and time of the visit, the duration of the visit, Plaintiff's IP address, her location at the time of the visit, her browser type, and the operative system on her devise.

43. Class Members share a similar narrative, and each experienced the interception of their electronic communications while visiting Defendant's Website as a result of the WM software acting as a wiretap.

44. Defendant's and QM's tracking and recording of keystrokes, mouse

clicks, data entry, and other electronic communications begins the moment a visitor first accesses or interacts with Defendant's Website.

45. When visitors access the Website and make a purchase, they enter PII. QM's software captures these electronic communications throughout each step of the process.

46. QM's software captures, among other things:
   (a) The visitor's mouse clicks;
   (b) The visitor's keystrokes;
   (c) The visitors' email address;
   (d) The visitors shipping and billing address;
   (e) The visitors' payment card information, including card number, expiration date, and CVV code;
   (f) The visitor's IP address;
   (g) The visitor's location at the time of the visit; and
   (h) The visitors' browser type and the operating system on their devices.

47. Crucially, Defendant Home Depot does not ask visitors, including Plaintiff and Class Members, whether they consent to being wiretapped by Defendant and QM. Visitors are never actively told that their electronic communications are being wiretapped by Defendant and QM.

48. Further, Home Depot's privacy policy is located at the very bottom of the Website's home page with no notice directing visitors to the privacy policy, i.e., the hyperlink to the privacy policy functions as a browsewrap. Additionally, Defendant began recording visitors before any purported disclosure was made *after* the wiretap had already begun.

49. Moreover, visitors are not on notice of the hyperlink to the privacy policy when they select to place an order, or at any other time during their visit to the Website.

50. Therefore, visitors like Plaintiff and Class Members never agree or are

never given the option to agree to the privacy policy when using the Website, nor are they on notice of the privacy policy.

51. Even if visitors do agree to the privacy policy by using the Website or otherwise- and they do not for the reasons stated above – Home Depot does not mention QM or its session replay software (such as by disclosing that visitors will have their mouse clicks and keystrokes recorded in real time) in the Website's privacy policy. As such, visitors do not agree to be wiretapped even if they agree to the privacy policy.

52. Plaintiff and Class Members did not consent to being wiretapped on the Website, nor to having their communications recorded and shared with QM and Defendant. Any purported consent that was obtained was ineffective because (i) the wiretapping began from the moment Plaintiff and Class Members accessed the Website; (ii) the privacy policy did not explicitly disclose the wiretapping or QM; and (iii) the hyperlink the privacy policy is inconspicuous and therefore insufficient to provide notice.

## VII. CLASS ALLEGATIONS

53. Plaintiff brings this class action lawsuit individually and on behalf of the proposed class under Rule 23 of the Federal Rules of Civil Procedure.

> California residents who visited the Website, and whose electronic communications were intercepted or recorded by QM on behalf of Defendant, without their prior consent (the "Class" or "Class Members").

54. Excluded from the class are the following individuals: officers and directors of Defendant and its parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

55. Plaintiff reserves the right to modify or amend the definitions of the

proposed class before the Court determines whether certification is appropriate.

56.  <u>Numerosity</u>. The members of the class are so numerous that a joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Plaintiff believes the Class numbers in the tens of thousands, if not more.

57.  <u>Typicality</u>. Plaintiff's claims are typical of the claims of the class members because, among other things, Plaintiff sustained similar injuries to that of Class Members as a result of Defendant's uniform wrongful conduct, and their legal claims all arise from the same events and wrongful conduct by Defendant.

58.  <u>Adequacy</u>. Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff's interests do not conflict with the interests of the Class Members and Plaintiff has retained counsel experienced in complex class action cases to prosecute this case on behalf of the class.

59.  <u>Commonality</u>. Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual members of the class, including the following:

   i.   Whether Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631 and 635;
   ii.  Whether Defendant has invaded Plaintiff's privacy rights in violation of the California Constitution;
   iii. Whether, as a result of Defendant's conduct, Plaintiffs and the class members suffered injury; and
   iv.  The nature of the relief, including equitable relief, to which Plaintiff and Class Members are entitled.

60.  <u>Ascertainability</u>. Class Members can easily be identified by an examination and analysis of the business records maintained by Defendant, among other records within Defendant's possession, custody, or control.

61.  <u>Predominance</u>. The common issues of law and fact identified above

predominate over any other questions affecting only individual members of the class. The class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's conduct.

62. <u>Superiority</u>. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since a joinder of all members is impracticable. Furthermore, as damages suffered by Class Members may be relatively small, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

63. Accordingly, this class action is properly brought and should be maintained as a class action because questions of law or fact common to class members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

64. This class action is also properly brought and should be maintained as a class action because Plaintiff seeks injunctive relief and declaratory relief on behalf of the Class Members on grounds generally applicable to the proposed class. Certification is appropriate because Defendant has acted or refused to act in a manner that applies generally to the proposed class, making final declaratory or injunctive relief appropriate.

## FIRST CAUSE OF ACTION

**Violation Of The California Invasion of Privacy Act,**

**Cal. Penal Code § 631**

65. Plaintiff re-alleges and incorporate by reference each and every allegation contained elsewhere in this Complaint as if fully set forth herein.

66. Plaintiff brings this claim individually and on behalf of the members of the proposed Class.

67. To establish liability under section 631(a), Plaintiff need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

68. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its

remedial purpose of protecting privacy); *Bradley v. Google, Inc.,* No. C 06-05289 WHA, 2006 WL 3798134, at *5 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 611 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

69. QM's software, including its session replay feature, is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

70. At all relevant times, by using QM's technology, Defendant intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiff and Class Members on the one hand, and Home Depot's Website on the other hand.

71. At all relevant times, by using QM's technology, Defendant willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and putative Class Members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

72. QM's technology provides real-time visibility into all behavioral, technical, and segment data.

73. Home Depot employed QM to accomplish the wrongful conduct at issue.

74. Plaintiff and Class Members did not consent to any of Defendant's actions in implementing QM's wiretaps on the Website. Nor have Plaintiff nor Class Members consented to Defendant's intentional access, interception, reading, learning, recording, and collection of Plaintiff and Class members' electronic communications.

75. The violation of section 631(a) constitutes an invasion of privacy

sufficient to confer Article III standing.

76. Unless enjoined, Defendant will continue to commit the illegal acts alleged here. Plaintiff continue to be at risk because she frequently uses the internet to shop for home improvement products, and she continues to desire to use the internet for that purpose. QM provides its software, including the session replay feature, to many other website operators who offer a wide array of services. For many websites that Plaintiff may or is likely to visit in the future, she has no practical way to know if her website communications will be monitored or recorded by QM.

77. Plaintiff and Class Members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

## SECOND CAUSE OF ACTION

### Violation Of The California Invasion Of Privacy Act,

### Cal. Penal Code § 635

78. Plaintiff re-alleges and incorporate by reference each and every allegation contained elsewhere in this Complaint as if fully set forth herein.

79. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

80. California Penal Code § 635 provides, in pertinent part:

> Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another, or any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless

telephone and a landline telephone in violation of Section 632.6 , shall be punished by a fine not exceeding two thousand five hundred dollars.

81. At all relevant times, by implementing QM's wiretaps, Defendant intentionally possessed, transported, imported, and/or furnished a wiretap device that is primarily or exclusively designed or intended for eavesdropping upon the communication of another.

82. QM's code is a "device" that is "primarily or exclusively designed" for eavesdropping. That is, the QM's code is designed to gather PII, including keystrokes, mouse clicks, and other electronic communications

83. Plaintiff and Class Members did not consent to any of Defendant's actions in implementing QM's wiretaps.

84. Unless enjoined, Defendant will continue to commit the illegal acts alleged here. Plaintiff continues to be at risk because she frequently uses the internet to shop for home improvement products, and she continues to desire to use the internet for that purpose. QM provides its software, including the session replay feature, to many other website operators who offer a wide array of services. For many websites that Plaintiff may or is likely to visit in the future, she has no practical way to know if her website communications will be monitored or recorded by QM.

85. Plaintiff and Class Members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

## THRID CAUSE OF ACTION

### Invasion Of Privacy Under California Constitution

86. Plaintiff re-alleges and incorporate by reference each and every allegation contained elsewhere in this Complaint as if fully set forth herein.

87. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

88. Plaintiff and Class members have an interest in: (1) precluding the

dissemination and/or misuse of their sensitive, confidential PII; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various Internet sites without being subjected to wiretaps without Plaintiff's and Class members' knowledge or consent.

89. At all relevant times, by implementing QM's wiretaps on its Website, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

90. Plaintiff and Class Members had a reasonable expectation that their PII and other data would remain confidential and that Defendant would not install wiretaps on the Website.

91. This invasion of privacy is serious in nature, scope and impact.

92. This invasion of privacy alleged here constitutes an egregious breach of the social norms underlying the privacy right.

93. Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter a judgment in their favor and against Defendant, as follows:

(a). For an order certifying the Classes under Rule 23 and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class her reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a trial by jury of all issues so triable.

DATED: July 16, 2021     Respectfully submitted,

*/s/ Ronald A. Marron*
Ronald A. Marron
**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON
*ron@consumersadvocates.com*
ALEXIS M. WOOD
*alexis@consumersadvocates.com*
KAS L. GALLUCCI
*kas@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

***Attorney for Plaintiff and the Proposed Class***